1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN ROSSUM,<br><br>                              Petitioner,<br><br>                    vs.<br><br>L.E. SCRIBNER, et al.,<br><br>                              Respondents. | Civil No.          07-1590 JLS (JMA)<br><br>**REPORT AND RECOMMENDATION RE:**<br><br>**(1)  DENYING PETITION FOR WRIT OF HABEAS CORPUS;**<br><br>**(2) DENYING REQUEST FOR AN EVIDENTIARY HEARING; and**<br><br>**(3) DENYING REQUEST FOR DISCOVERY** |

## I.      INTRODUCTION

Kristin Rossum, a state prisoner represented by counsel, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging her San Diego County Superior Court conviction in case number SCD 160961 for one count of first degree murder.  (Lodgment No. 1, vol. 2 at 360.)  She contends her trial attorneys were ineffective when they failed to investigate and present a defense based on challenging the cause of death, failed to investigate possible contamination of the autopsy samples, failed to object to the admission of prejudicial evidence, failed to object to the statements made by the prosecutor in his opening and closing arguments and failed to request a limiting instruction with regard to certain evidence.  (*See* Petition ("Pet.") at 6-7; Pet'rs Mem. of P. & A in Supp. of Pet. ("Pet'rs Mem.") 2-50.)  Rossum also contends that the cumulative effect of counsels' errors violated her right

/ / /

to effective assistance of counsel, in violation of her federal constitutional rights. (Pet. at 8; Pet'rs Mem. at 50-52.)

In addition, Rossum asks this Court to conduct an evidentiary hearing to determine whether counsels' decisions were based on strategic considerations, what those strategic considerations were and whether Rossum was prejudiced by any of counsels' alleged errors. (Pet'rs Req. for Evid. Hr'g and Disc. [doc. no. 11] at 1-3.) Rossum also asks this Court for an Order permitting the testing of the autopsy specimens to determine whether the specimens have been tampered with. (*Id.* at 4-5.)

The Court has considered the Petition, Respondents' Answer and Memorandum of Points and Authorities in Support Thereof ("Resp'ts Mem."), Petitioner's Traverse and all the supporting documents submitted by the parties. Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court recommends that the Petition, the Request for an Evidentiary Hearing and the Request for Discovery be **DENIED**.

## II.   **FACTUAL BACKGROUND**

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1)(West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness). The facts as found by the state appellate court are as follows:

A.   *The early years of Rossum and de Villers's relationship*

Rossum became addicted to methamphetamine during high school. She continued to use methamphetamine periodically during college. In December of 1994, while in college, Rossum left school without telling her parents, and her whereabouts were unknown. In early 1995, Rossum was 18 years old and living in a motel room in Chula Vista. She met de Villers at the border crossing between San Diego and Tijuana. The two quickly became lovers and Rossum moved into de Villers's apartment. De Villers helped Rossum to quit using methamphetamine, and she re-enrolled in college. In October of 1996, de Villers and Rossum became engaged. They married in June 1999.

B.   *Rossum has an extramarital affair with Robertson, her supervisor at the Office of the Medical Examiner*

While in college in 1997, Rossum obtained employment as a student worker at the San Diego County Office of the Medical Examiner (OME). In March 2000, the OME hired Rossum as a toxicologist. A toxicologist analyzes body fluids for the purpose of determining whether drugs are present.

-2-

Robertson began working at the OME in the Spring of 2000. Robertson was Rossum's supervisor. At trial, Rossum admitted that she began having a sexual relationship with Robertson in June 2000, and that the two had exchanged intimate emails prior to this date. Coworkers suspected Rossum and Robertson were having an affair. On three separate occasions, Robertson denied that he was having an affair with Rossum when he was asked by Lloyd Amborn, the operations administrator of the OME. Robertson also told Donald Lowe, a toxicologist at the OME, that he was not having an affair with Rossum.

C.    *Greg de Villers's death*

In October 2000, Rossum started using methamphetamine again. On November 2, de Villers told Rossum he suspected she was using drugs and that she was having an affair with Robertson. De Villers demanded that Rossum quite her job at the OME. He threatened to reveal her drug use and her affair with Robertson to Rossum's employers if she refused to quit her job.

Rossum testified that when de Villers woke up on the morning of Monday, November 6, 2000, he "sounded kind of out of it" and that his speech was slurred. At 7:42 a.m., Rossum left a message on de Villers's voice mail at his work place saying that he was not feeling well and that he would likely be taking off the entire day. De Villers went back to sleep.

Rossum went to the OME at 8:00 that morning. At approximately 9:00 a.m., coworkers saw Rossum in Robertson's office, crying. At about 12:10 p.m., Herman Schledwitz, the manager of Rossum's apartment complex, saw Rossum running into her apartment. At 12:41 p.m., Rossum purchased several items at a Vons grocery store, including a single rose. Rossum testified that after she went to the grocery store, she ate lunch with de Villers at the kitchen table in their apartment. Rossum testified that when she asked de Villers why he had been so out of it that day, he told her that he had taken some oxycodone and clonazepam that Rossum had previously obtained when she was trying to end her methamphetamine addiction. After lunch, according to Rossum, de Villers went back to bed.

Rossum returned to work for a short period of time, but left again at 2:30 p.m. Schledwitz saw Rossum's car in the parking lot of her apartment complex at 2:45 p.m. Later that afternoon, Rossum met Robertson at a trail behind some houses, where they would often meet. Rossum stayed with Robertson until about 5:00 p.m. and then returned to her apartment. At about 6:30 p.m., Rossum left the apartment to run some errands. She returned home about 8:00 p.m. Rossum testified that when she returned home, de Villers still appeared to be sleeping. She kissed him on the forehead before taking a bath and shower. After taking her bath and shower, Rossum found de Villers cold to the touch and not breathing.

At 9:22 that night, Rossum called 911. She told the operator that de Villers had not been feeling well and that he had suddenly stopped breathing. The operator instructed Rossum to move de Villers to the floor and begin administering CPR. Paramedics arrived minutes later. They found de Villers's body on the floor next to his bed. Fresh looking red rose petals and a stem were strewn around his body. Rossum initially told the paramedics that de Villers had not taken any drugs as far as she knew, but later told them that de Villers may have taken oxycodone. The paramedics transported de Villers to the hospital.

At 10:06 p.m. Rossum placed a telephone call to Robertson. Robertson met Rossum at the hospital. De Villers was pronounced dead at the hospital at 10:19 p.m.

07cv1590

Rossum told a nurse at the hospital that de Villers may have overdosed on oxycodone. While at the hospital, a nurse saw Robertson kissing Rossum on the mouth.

D.   *The investigation*

Amborn decided that the toxicology tests to be performed on de Villers's body fluids should be performed by an agency other than the OME, in order to avoid any potential conflict of interest. This was the first time Amborn had used an outside agency to conduct such tests. When Amborn told Robertson he had decided to have the tests performed outside the OME, Robertson expressed shock.

San Diego County Medical Examiner, Dr. Brian Blackbourne, performed an autopsy on de Villers's body the day after his death. He determined that de Villers had been dead for at "least an hour or so" by the time paramedics arrived at the apartment. Blackbourne also opined that de Villers had developed early pneumonia, and that he had a significant amount of urine in his bladder. Blackbourne found needle marks on de Villers's body, including one in the groin area. After receiving toxicology results of de Villers's body fluids, Blackbourne determined that de Villers had died of acute fentanyl intoxication. The toxicology results also showed that de Villers had oxycodone and clonazepam in his system at the time of his death.

On November 28, 2000, an audit was conducted at the OME for the purpose of determining whether any fentanyl was missing. Fifteen fentanyl patches that had been impounded in three different cases, and a vial of the fentanyl standard [footnote 3: A drug standard is a quantity of a particular drug used as reference material during testing procedures], were missing from the OME. Rossum had worked on all three cases in question and had logged in the fentanyl standard.

In December 2000, the OME conducted an evidentiary audit of all cases in which methamphetamine had been listed as the cause of death. In seven of eight cases in which methamphetamine had been impounded by the OME, the methamphetamine was missing.

(Lodgment No. 8 at 3-7.)

## III.   **PROCEDURAL BACKGROUND**

On November 6, 2001, the San Diego County District Attorney's Office filed an information charging Rossum with the murder of Gregory de Villers, a violation of California Penal Code ("Penal Code") section 187(a). (Lodgment No. 1, vol. 1 at 0001-02.) The information also alleged a special circumstance that Rossum intentionally killed de Villers by the administration of poison, within the meaning of Penal Code section 190.2(a)(19). (*Id.*)

Following a jury trial, Rossum was convicted of first degree murder. The jury also found the special circumstances allegation true. (Lodgment No. 1, vol. 2 at 0360.) Rossum was sentenced to life in prison without the possibility of parole. (Lodgment No. 1, vol. 3 at 0639-639.1.)

/ / /

1    Rossum filed a direct appeal of her conviction and concurrent petition for writ of habeas corpus

2    in the California Court of Appeal for the Fourth Appellate District, Division One, which upheld her

3    conviction and sentence in an unpublished opinion and denied the petition in a separate unpublished

4    opinion.  (*See* Lodgment Nos. 3, 4, 5, 6, 7, 8[1], 9.)  Rossum then filed a petition for review in the

5    California Supreme Court, which that court denied without citation of authority.  (*See* Lodgment Nos.

6    10, 11.)  Rossum then filed a petition for writ of habeas corpus in the California Supreme Court, which

7    was denied without citation of authority.  (*See* Lodgment Nos. 12, 13.)

8    Rossum filed the instant petition in this Court on August 10, 2007 (doc. no. 1).  Respondents

9    filed an Answer and Memorandum of Points and Authorities in Support of the Answer on November

10   13, 2007 (doc. no. 8).  Rossum filed a Traverse on December 21, 2007 and a Request for an Evidentiary

11   Hearing and Discovery on December 26, 2007 (doc. nos. 9, 10, 11).

12   **IV.**   **DISCUSSION**

13        **A.**   **Scope of Review**

14        Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal

15   habeas corpus claims:

16        The Supreme Court, a Justice thereof, a circuit judge, or a district court shall
17        entertain an application for a writ of habeas corpus in behalf of a person in custody
         pursuant to the judgment of a State court only on the ground that he is in custody in
18        *violation of the Constitution or laws or treaties of the United States.*

19   28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).  As amended, 28 U.S.C. § 2254(d) reads:

20        (d) An application for a writ of habeas corpus on behalf of a person in custody
         pursuant to the judgment of a State court shall not be granted with respect to any claim
21        that was *adjudicated on the merits* in State court proceedings unless the adjudication of
         the claim –
22
         (1) resulted in a decision that was contrary to, or involved an
23       unreasonable application of, clearly established Federal law, as
         determined by the Supreme Court of the United States; or
24
         (2) resulted in a decision that was based on an unreasonable
25       determination of the facts in light of the evidence presented in the State
         court proceeding.
26

27   28 U.S.C.A. § 2254(d)(1)-(2) (West 2006) (emphasis added).

28

---

[1] The court did, however, strike the restitution fine because it violated Penal Code section 1202.45.

"[The Anti-Terrorism and Effective Death Penalty Act] (AEDPA) establishes a 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Womack v. Del Papa*, 497 F. 3d 998, 1001 (9th Cir. 2007) (quoting *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)). To obtain federal habeas relief, Rossum must satisfy either section 2254(d)(1) or section 2254(d)(2). *See Williams v. Taylor*, 529 U.S. 362, 403 (2000). The Supreme Court interprets section 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law. *Id.*

**B.     Analysis**

Rossum claims she received ineffective assistance of trial counsel for several reasons. She claims trial counsel improperly conceded that fentanyl poisoning was the cause of de Villers' death and failed to investigate an alternative cause of death; failed to investigate whether the specimens obtained from de Villers' autopsy were contaminated; failed to object to the admission of evidence regarding Rossum's drug use before and after de Villers' death; failed to object to comments made by the prosecutor during opening and closing statements; failed to object to the testimony of a

methamphetamine expert; and failed to request a limiting jury instruction with regard to the drug evidence. She also contends that the cumulative effect of counsels' errors violated her right to effective assistance of counsel. (Pet. at 6-8; Pet'rs Mem. at 2-50.) Respondents contend that the state courts' disposition of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Resp's Mem. in Supp. of Answer ("Resp's Mem.") at 1-19.)

1.    *Clearly Established Supreme Court Law – Ineffective Assistance of Counsel*

To establish ineffective assistance of counsel, Rossum must first show that her trial counsels' performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Judicial scrutiny of counsel's performance must be "highly deferential." *Id.* at 689. Second, she must show counsel's deficient performance prejudiced the defense. *Id.* at 687. This requires a showing that counsel's errors were so serious they deprived Rossum "of a fair trial, a trial whose result is reliable." *Id.* To satisfy the prejudice prong, Rossum must demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. The prejudice inquiry is to be considered in light of the strength of the prosecution's case. *Luna v. Cambra*, 306 F.3d 954, 966 (9th Cir.), *amended*, 311 F.3d 928 (9th Cir. 2002).

2.    *Factual Background to the Ineffective Assistance of Counsel Claims*

San Diego County Medical Examiner Dr. Brian Blackbourne performed the autopsy on de Villers. He testified de Villers had a significant amount of congestion in his lungs which indicated that he was not fully conscious and had not been breathing normally for six to twelve hours before his death. (Lodgment No. 2, vol. 8 at 516-17.) In addition, de Villers' bladder contained 550 milliliters of urine, which would have also taken about six to twelve hours to accumulate. (*Id.* at 518-19.) Normally, a person would have a strong urge to empty their bladder at 400 milliliters. (*Id.* at 520.) Blackbourne opined that de Villers' physical condition was consistent with him being "out of it" from 7:30 a.m. until 9:30 p.m the day he died. (*Id.* at 519.) Blackbourne also testified he found five needle marks on de Villers' body, three on the interior of the left elbow, one on the interior right elbow and one in the groin.

1   (*Id.* at 520).  Paramedics testified they were responsible for two puncture marks on the left interior

2   elbow and the one puncture mark on the right interior elbow.  (Lodgment No. 2, vol. 12 at 1266, 1269).

3   The groin puncture wound resulted from emergency room doctors' efforts to revive de Villers.

4   (Lodgment No. 2, vol. 12 at 1248.)  The fifth puncture remained unaccounted for.

5          Normally, specimens taken from an autopsy would be tested by the Medical Examiner's Office.

6   Because de Villers was a relative of a Medical Examiner's Office employee, arrangements were made

7   to have the specimens sent out for testing.  (Lodgment No. 2, vol. 8 at 521.)  Blackbourne requested the

8   specimens be screened for alcohol, basic drugs of abuse (which included oxycodone), aspirin and

9   clonazepam.  (*Id.* at 522.)  He specifically requested the clonazepam screen because Rossum had told

10   various people associated with the case, such as the paramedics who were working on de Villers, an

11   emergency room nurse, a Medical Examiner's Office investigator and de Villers' brothers Bertrand and

12   Jerome, that he may have taken oxycodone and/or clonazepam.  (Lodgment No. 2, vol. 8 at 522-23; vol.

13   12 at 1130, 1218; vol. 9 at 721; vol. 11 at 957; vol. 16 at 1807.)  He did not ask for the specimens to be

14   screened for fentanyl because there was no indication at that time that fentanyl was present.  (Lodgment

15   No. 2, vol. 8 at 523.)  The autopsy specimens were supposed to be sent to the sheriff's office for

16   toxicology testing.  Frank Barnhart, a former Medical Examiner's Office employee who worked for the

17   sheriff's department was supposed to take custody of the specimens immediately following the autopsy,

18   but was unable to do so.  (*Id.* at 521.)  The specimens were stored in the Medical Examiner's refrigerator

19   for thirty-six hours until Barnhart could take custody of them.  (*Id.* at 521-22.)  All toxicologists who

20   worked at the Medical Examiner's Office had a key with which they could enter the building during off

21   hours.  (*Id.* at 442.)

22          On November 16, 2000, Blackbourne received a call from Barnhart.  Test results on de Villers'

23   specimens had revealed a very small level of oxycodone and an amount of clonazepam in the high

24   therapeutic range.  (*Id.* at 543-44.)  One of the labs also identified fentanyl in the specimens.  (*Id.* at 524-

25   25.)  Further testing revealed large quantities of fentanyl in de Villers' stomach contents, blood, urine,

26   peripheral blood, antemortem blood and forearm tissue.  (*Id.* at 555-56.)  The levels of fentanyl in de

27   Villers' body were stipulated to at trial.  (*Id.*)  Blackbourne testified that de Villers died of acute fentanyl

28   intoxication.  (*Id.* at 525.)

After fentanyl was discovered in de Villers' body, police asked the Medical Examiner's Office to conduct an audit of the drugs stored in the office. A total of ten milligrams of liquid fentanyl and fifteen fentanyl patches, in varying strengths, were missing. (Lodgment No. 2, vol. 8 at 401-16.) According to Medical Examiner's Office records, Rossum had logged in the liquid fentanyl and had worked on each of the cases in which the fentanyl patches were logged in as evidence from a death scene. (*Id*.)

Dr. Theodore Stanley, an expert in anesthetic drugs such as fentanyl, testified that fentanyl is a very strong pain reliever and anesthetic which can cause unconsciousness, slowed or stopped breathing and death when taken in too large a quantity. (Lodgment No. 2, vol. 9 at 632-34.) It can be administered orally, intravenously and through a patch applied to the skin. (*Id.* at 635-36.) Dr. Stanley testified that fentanyl does not have a taste. (*Id.* at 670.) Fentanyl has what is known as a "synergistic effect" when taken in combination with other drugs, such as oxycodone and clonazepam. (*Id.* at 642.) "Synergism" occurs when two drugs taken together have more than an additive effect on the user; rather, they compound the effects of each. (*Id.*) Fentanyl also inhibits a person's ability to remember to empty their bladder. (*Id.* at 644.) According to Dr. Stanley, at four nanograms per milliliter of blood, a person who had never taken an opiate drug before would experience very slow breathing or no breathing at all. (*Id.* at 645.) At fifty-seven nanograms per milliliter of blood, the level at which de Villers' blood tested, a person would be unconscious and probably not be breathing. (*Id.* at 646-49, 663.) Further, Dr. Stanley testified that because the levels found in the stomach and blood were so high, the drug was probably introduced in more than one way. (*Id.* at 651-52, 658-59.) To achieve the concentration of fentanyl in de Villers' stomach, Dr. Stanley said he would have had to orally ingest ten to twenty milligrams of fentanyl. (*Id.* at 659.) De Villers would have felt the effects of such an ingestion of fentanyl in twenty to thirty minutes, such as slurred speech and sedation, and within an hour would have had a "profound decreases in respiratory rate" and periods of apnea or cessation of breathing. (*Id.* at 660.) Although Dr. Stanley could not say for certain how the levels of fentanyl had gotten so high, he testified that the levels were consistent with multiple applications of fentanyl patches in conjunction with oral ingestion. (*Id.*)

Rossum testified that on the Thursday before he died, she and de Villers arrived home for lunch. De Villers saw Rossum reading a letter and wrestled it out of her hands. It was a letter from Robertson.

(Lodgment No. 2, vol. 20 at 2490-91.)  She and de Villers argued over her affair with Robertson and his suspicion that she had started using drugs again.  De Villers threatened to reveal her affair and her drug use to the Medical Examiner's Office.  (*Id.* at 2492-93.)  Rossum testified she and de Villers had a tense weekend.  (*Id.* at 2499-500.)  De Villers got up sometime during Sunday night complaining he could not sleep, then uncharacteristically snored during the rest of the night.  (*Id.* at 2515.)  Rossum claimed that on Monday morning, the day of his death, de Villers woke up with a slurry voice, and Rossum told him she would call his work to tell them he would not be in.  (*Id.* at 2516.)  She went to work, but returned home around ten in the morning; de Villers was still sleeping.  She returned home again for lunch around twelve.  (*Id.* at 2419-20.)  She asked de Villers why he was still so "out of it," and de Villers allegedly told her he had taken some of her old prescriptions.  (*Id.* at 2529.)  She and de Villers had lunch, de Villers went back to bed and she went back to work.  (*Id.* at 2522-23.)  When she returned home at 5:30, de Villers was still sleeping.  (*Id.* at 2527-28.)  She made dinner, went out to do some errands, and returned about eight in the evening.  (*Id.* at 2530-31.)  De Villers was still sleeping, so she took a bath and shower.  When she finished bathing, she went to check on de Villers.  He was cold to the touch and not breathing, and she called 911.  (*Id.* at 2534-35.)

Friends, family and colleagues of de Villers uniformly testified that de Villers would not have committed suicide.  De Villers did not take any kind of drugs, including over the counter medications such as aspirin, and was a mentally strong person, handled stress well, was not prone to emotional outbursts or reactions and had not been under the care of a mental health professional.  They also testified that in the weeks before his death he was making plans for his future.  (Lodgment No. 2, vol. 11 at 915, 924, 927-28, 957, 970, 985-86 [testimony of Bertrand de Villers]; vol. 13 at 1304, 1308, 1319, 1324, 1328  [testimony of Stefan Gruenwald], vol. 14 at 1512-14, 1519 [testimony of Christopher Wren], 1528-29, 1537 [testimony of William Leger], 1548-49 [testimony of Christian Colantoni], 1559-62 [testimony of Chirstian Maclean], 1568-69 [testimony of Daniel Maltbie], 1573-76 [testimony of Laurie Shriber]; vol. 16 at 1802-03, 1809, 1818, 1827, 1833, 1834, 1841-42 [testimony of Jerome de Villers].)

/ / /

/ / /

### 3.    *Dr. Richeimer's Affidavit*

In support of her petition, Rossum has submitted the affidavit of Dr. Steven Richeimer, who is the Director of Pain Management at the University of Southern California's Keck School of Medicine and who has extensive experience with fentanyl.  (Pet'rs Ex. E.)  In the affidavit, Dr. Richeimer states that he has reviewed the transcript of testimony of Dr. Blackbourne, Dr. Theodore Stanley, toxicologist Michael Henson and Dr. Mark Wallace.  Dr. Richeimer also reviewed the toxicology results from the three labs which tested the specimens obtained from de Villers' autopsy.  He states that fentanyl is very potent and fast-acting.  (*Id.* at 4.)  He notes that "[i]f very high doses are rapidly administered, then death would likely occur rapidly," which is not consistent with Dr. Blackbourne's testimony that de Villers was likely unconscious for six to twelve hours before his death.  (*Id.*)  He also notes that "if the fentanyl absorbed gradually, . . . then it would be unexpected for the victim to survive long enough for the blood levels to reach the extremely high levels that were found in the decedent."  (*Id.*)  Dr. Richeimer states the extremely high levels of fentanyl could be explained by contamination of the specimens after they were removed from the body and that this is a more compelling explanation of the extremely high levels of fentanyl found in de Villers' body.  Finally, he states that testing of the specimens for fentanyl metabolite would conclusively establish whether contamination had occurred.  (*Id.* at 4-5.)  Dr. Richeimer's affidavit does not state that oxycodone and/or clonazepam were more likely the cause of de Villers' death.  (*See* Pet'rs Ex. E.)

### 4.    *Failure to Investigate an Alternative Cause of Death*

Rossum claims that counsel erred by conceding the cause of de Villers' death was fentanyl poisoning.  Once this concession was made, she contends, it was nearly impossible for counsel to successfully argue that de Villers self-administered the fentanyl because prosecution experts testified that fentanyl is extremely potent, rendering a person unconscious at concentrations far below those found in de Villers' body.  (Pet. at 6-6B; Pet'rs Mem. at 2-33.)  Respondents claim the state court properly denied this claim, and that the denial was neither contrary to nor an unreasonable application of, clearly established Supreme Court law.  (Resp'ts Mem. at 9-16.)

Rossum raised this claim in a habeas corpus petition she filed in the California Supreme Court. (Lodgment Nos. 12, 13.)  That court denied the petition without citation of authority.  Because there is

1   no lower court decision to which this Court can look through, this Court must conduct an independent

2   review of the record to determine whether the state court's denial of the claim was contrary to, or an

3   unreasonable application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.

4        Rossum's defense at trial was that de Villers, upset and despondent over Rossum's affair and

5   her desire to leave the marriage, committed suicide either by taking her old prescriptions of oxycodone

6   and clonazepam, or by taking fentanyl, which he obtained from the Medical Examiner's Office during

7   one of the times he visited her at work.  To support this theory, the defense elicited testimony from

8   Rossum that during the months before de Villers' death she expressed doubts about her marriage to her

9   brother and a friend, had begun to search for a separate apartment and had tried to discuss to idea of a

10  trial separation with de Villers.  De Villers was increasingly upset about the impending collapse of the

11  marriage.  (Lodgment No. 2, vol. 20 at 2475-90.)  She also testified that de Villers had accompanied her

12  to her office on several occasions on which he would have had access to fentanyl.  (Lodgment No. 2,

13  vol. 20 at 2531-32.)

14       Rossum contends that counsel should not have conceded that an overdose of fentanyl, which

15  Rossum had access to at the Medical Examiner's Office, was the cause of de Villers' death, but rather

16  should have argued that an overdose of oxycodone and clonazepam, which Rossum claimed de Villers'

17  had access to at home and which he told her he took, was the cause.  (Pet'rs Mem. at 28.)  There is no

18  evidence in the record, however, to support such a theory.  Dr. Blackbourne  testified that the level of

19  clonazepam in de Villers' system was within the high therapeutic range, and that there was merely a

20  "trace" of oxycodone.  (Lodgment No. 2, vol. 8 at 526, 543-45.)  Dr. Blackbourne also unequivocally

21  stated that clonazepam did not kill de Villers.  (*Id.* at 545.)  Moreoer, the affidavit of Dr. Richeimer

22  provided by Rossum does not state that oxycodone and/or clonazepam were more likely the cause of

23  de Villers' death.

24       In any event, the audit conducted at the Medical Examiner's Office showed that not only was

25  a significant amount of fentanyl missing, but also clonazepam and oxycontin, which is a time-released

26  form of oxycodone.  (Lodgment No. 2, vol. 9 at 591-92.)  Thus, establishing that de Villers died of an

27  overdose of oxycodone and clonazepam instead of fentanyl would not have proved that de Villers took

28  the drugs which killed him in order to commit suicide rather than that Rossum administered

the drugs to him without his knowledge and murdered him.  Applying the substantial deference to counsels' actions required by *Strickland*, Rossum has not rebutted the strong presumption that it was a reasonable strategic decision to concede that a fentanyl overdose caused de Villers' death.  In the face of strong evidence supporting such a conclusion, contesting the cause of death would not have advanced Rossum's defense in any measurable way.  *See Strickland*, 466 U.S. 668-89.  And, because Rossum had access to fentanyl, oxycodone and clonazepam and all three drugs were missing from the Medical Examiner's Office, she has not established a reasonable probability, sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different had counsel been successful in establishing de Villers died of an overdose of one or two of these drugs but not the other.  *Id*. at 689, 694.

Accordingly, based on an independent review of the record, the state court's silent denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  Rossum is not entitled to relief as to this claim.

5. *Failure to Investigate Whether the Autopsy Specimens Were Contaminated*

Rossum also contends that trial counsel should have investigated whether the specimens from de Villers' autopsy were contaminated with fentanyl after they were removed from de Villers' body. Specifically, she states that because the volume of fentanyl in the specimens was so high, and because the specimens were stored in the medical examiner's refrigerator for thirty-six hours before they were sent out for testing, the specimens should have been tested for fentanyl metabolite to determine whether the fentanyl had been placed in the specimens after they were removed from de Villers' body.  (Pet. at 6-6B; Petr's Mem. at 2-33.)

a. *Analysis*

Rossum contends that because of the fast-acting nature of fentanyl, the most logical explanation of the extremely high levels of fentanyl found in the de Villers' body was contamination of the specimens.  (Pet'rs Mem. at 20-33.)  Rossum points specifically to several apparently contradictory findings from the autopsy to support her contention:  (1) the extremely high levels of fentanyl in de Villers' stomach suggest a significant amount was ingested orally, which would have produced death in a hour or two; (2) if the amount of fentanyl found in de Villers' body was injected, which was a

1   possibility due to testimony regarding the number of needle marks on de Villers' body, death would

2   have occurred in a few minutes; and (3) de Villers was unconscious or immobile for six to twelve hours

3   before he died.  (*See* Lodgment No. 2, vol. 8 at 516-17 [testimony of Dr. Blackbourne]; vol 9 at 651-56

4   [testimony of Dr. Stanley].)  Rossum also points out there was an opportunity for the samples to be

5   tainted during the thirty-six hours the specimens were kept in the refrigerator located in the Medical

6   Examiner's Office.  She argues the specimens could have been contaminated with fentanyl which was

7   being stored at the Medical Examiner's Office, or by a Medical Examiner employee who harbored ill

8   will toward her and/or Robertson.  (Pet'rs Mem. at 26-28.)  Respondents contend that the state court's

9   adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established

10  Supreme Court law.  (Resp'ts Mem. at 9-15.)

11         "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

12  undermined the proper functioning of the adversarial process that the trial cannot be relied upon as

13  having produced a just result."  *Strickland*, 466 U.S. at 686.  Counsels' actions must be evaluated "from

14  counsel's perspective at the time."  *Id.* at 689.  As with Rossum's preceding claim, and viewing

15  counsels' performance through the highly deferential lens required by *Strickland*, counsels' decision not

16  to investigate the possibility that the specimens were contaminated did not fall below "an objective

17  standard of reasonableness."  *Id.*, at 688, 689.

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

Rossum argues the variation in the toxicology results from de Villers' autopsy supports her claim that counsel should have investigated and presented a contamination defense.  The toxicology results were reported as follows:

|  | Alberta Justice | Pacific Toxicology | Assoc. Pathologists |
|---|---|---|---|
| stomach | 210 nano. per mill. 201 nano. per mill. | 286.5 nano. per mill. 329.7 nano. per mill. | 128 nano. per mill. |
| blood | — | 57.3 nano. per mill. 53.5 nano. per mill | 32.8 nano. per mill. |
| urine | — | 189 nano. per mill. | 236 nano. per mill. |
| peripheral blood | — | 11.2 nano. per mill. | — |
| antemortem blood | — | 35.8 nano. per mill. | — |
| forearm tissue | — | 21.3 grams | — |

nan. = nanogram
mill. = milliliter
—   = no results in the record

(Lodgment No. 2, vol. 8 at 555-57.)

Rossum points to the most significant variations between the three toxicology labs' results.  For example, Alberta Justice reported 210/201 nanograms of fentanyl per milliliter in de Villers' stomach, Pacific Toxicology reported 286.5/329.7 nanograms of fentanyl per milliliter and Associated Pathologists reported 128 nanograms of fentanyl per milliliter.  Dr. Blackbourne testified, however, that he found no significance in the variations of fentanyl reported by the labs, stating that "[i]t's all within laboratory error and sampling error."  (Lodgment No. 2, vol. 8 at 549.)  Similarly, Dr. Stanley testified that although there was a "big difference" between the 128 nanograms of fentanyl per milliliter in de Villers' stomach reported by Associated Pathology and the 201 nanograms reported by Alberta Justice, different laboratories measure things differently, and that "[t]he key is that's a lot of fentanyl in both of them."  (Lodgment No. 2, vol. 9 at 647.)  Dr. Richeimer's affidavit does not contradict this testimony. He states only that "[t]he inconsistency between the rapid action of fentanyl, the extraordinarily high concentration levels, and the lengthy period of impaired breathing and reduced consciousness *could* be explained by contamination of the specimens."  (Pet'rs Ex. E at 4) (emphasis added.)

-15-

Rossum also posits that during the thirty-six hours de Villers' autopsy specimens were stored in the Medical Examiner's Office refrigerator, any Medical Examiner's Office employee could have "spiked" the specimens with fentanyl. (Pet'rs Mem. at 27.) She contends that certain members of the office were biased against and had animosity toward her and Robertson because of their affair and the possibility that Rossum was being treated with favoritism. (*Id.*) Donald Lowe, a toxicologist at the Medial Examiner's Office for thirty-two years and who was passed over in favor of Robertson for the manager job, testified that the affair between Rossum and Robertson had a negative effect on the office's morale. (Lodgment No. 2, vol. 8 at 457, 463-64.) Lowe was also the person who alerted police that Rossum and Robertson were probably having an affair, which initiated the investigation into Rossum's role in de Villers' death. (*Id.* at 398-99.) Other Medical Examiner's Office employees also testified that they resented the fact that Robertson appeared to pay most of his attention to Rossum and her projects. (Lodgment No. 2, vol. 9 at 612 [testimony of Catherine Hamm];  761, 763-64 [testimony of Lloyd Amborn].)

While the fentanyl in de Villers' autopsy specimens almost assuredly came from the Medical Examiner's Office because it is a highly regulated drug, none of the Medical Examiner's employees expressed antipathy toward Rossum sufficient to credibly support a defense that they would take the extreme measure of stealing fentanyl from the Medical Examiner's Office and attempting to frame Rossum for de Villers' murder by contaminating de Villers' autopsy specimens with fentanyl. (*See* Lodgment No. 2, vol. 8 at 402-15.) Indeed, Rossum herself testified that she believed de Villers self-administered an overdose of fentanyl, oxycodone and clonazepam. (Lodgment No. 2, vol. 21 at 2569.) Counsels' decision not to attempt to point the finger of guilt at Rossum's fellow Medical Examiner's Office employees was reasonable when considered in this light.  Counsel may also have decided that such a tactic may have eroded any credibility or sympathy from the jury Rossum may have had. *See Strickland*, 466 U.S. at 686-89.

Rossum also argues that counsel rendered ineffective assistance by failing to have the autopsy specimens tested for fentanyl metabolite, which Dr. Richeimer states in his affidavit would establish whether the fentanyl was processed through de Villers' body and caused his death or was put into the specimens later. (Pet'rs Ex. E at 4-5.) As discussed above, however, because the contamination defense

was lacking in factual or logical support, and because there was no evidence of any other cause of death, counsels' decision not to conduct the testing was not objectively unreasonable. *See Strickland*, 466 U.S. at 686-89.

In any event, Rossum has not established she was prejudiced by any alleged errors committed by counsel. Rossum claims that de Villers told her he took oxycodone and clonazepam and that it was those two drugs, possibly acting in a synergistic manner, that killed him. (Pet'rs Mem. at 38-33.) As discussed above in Section IV(B)(4), however, because those two drugs were also missing from the Medical Examiner's Office, establishing that de Villers died of an overdose of oxycodone and clonazepam instead of fentanyl would have done little if anything to prove that de Villers, and not Rossum, was the agent of his own demise. Rossum has therefore not established a reasonable probability, sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different had counsel been successful in establishing de Villers died of an overdose of one of these drugs but not the others. *Strickland*, 466 U.S. at 689, 694.

b.       *Request for Discovery*

In conjunction with her ineffective assistance of counsel claim, Rossum asks this Court for an Order permitting her to test de Villers' autopsy specimens for fentanyl metabolite. Discovery and expansion of the record are appropriate tools to determine whether allegations not facially without merit have sufficient basis in fact so as to warrant an evidentiary hearing. *See Blackledge v. Allison*, 431 U.S. 63, 81-82 (1977). The Ninth Circuit's most recent discussion of the standard by which to decide post-conviction access to evidence is set forth in *Osborne v. District Att'ys Office for the Third Jud. Dist., et al.*, __ F.3d __, No. 06-35875 (9th Cir., Apr. 2, 2008). Osborne brought a claim pursuant to 42 U.S.C. § 1983 to compel the Anchorage District Attorney's Office to allow him post-conviction access to evidence used to convict him in order to submit the evidence to further, more refined DNA testing. Although Osborne brought his claim under 42 U.S.C. § 1983 and not 28 U.S.C. § 2254, Osborne sought the DNA testing for use in a future attack under 28 U.S.C. § 2254, and the Court in *Osborne* discussed section 2254 cases in its analysis of Osborne's claim. Accordingly, *Osborne* is the most recent Ninth Circuit precedent to which this Court must look for guidance.

/ / /

Osborne was convicted of kidnaping, assault and sexual assault in Alaska. The victim identified Osborne in a photographic lineup, and DQ Alpha DNA testing available at the time showed that the sperm found in a condom the assailant was alleged to have worn was consistent with Osborne's genetic profile. The frequency of the profile, however, was 14.7 to 16 percent, or one in every six or seven African American males. Another type of DNA testing, RLFP, which was slightly more discriminating than the DQ Alpha testing, was available at the time of Osborne's trial, but was not performed by either the prosecution or the defense. Following his conviction and appeal, he filed a federal civil rights action in order to compel production of the DNA samples and submit them to more sensitive DNA testing. Osborne stated he would use the results of those tests to support a future federal habeas corpus petition pursuant to 28 U.S.C. § 2254.

In its analysis, the court analogized Osborne's request to the kind of exculpatory material to which a defendant is entitled before trial under *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), which obligates the prosecution to "turn over evidence in its possession that is both favorable to the accused and material to guilt and punishment." *Ritchie*, 480 U.S. at 57. Applying this rationale to post-conviction situations as well, the court held that "the standard of materiality applicable to Osborne's claims for post-conviction access to evidence is no higher than a reasonable probability that, if exculpatory DNA evidence were disclosed to Osborne, he could prevail in an action for post-conviction relief." *Osborne*, slip op. at 3386. The court granted Osborne access to the specimens.

There are several facts that distinguish *Osborne* from Rossum's case. First, the DNA testing requested in *Osborne* was not available at the time Osborne was convicted. There has been no evidence presented that testing for fentanyl metabolite was not available at the time Rossum was prosecuted. Second, the DNA testing requested by Osborne may show that he did not commit the rape of which he was convicted. In contrast, while the testing for fentanyl metabolite requested by Rossum might disprove the prosecution's main theory as to what drug killed de Villers, it would not establish that Rossum did not kill him by other means. Finally, as discussed above, even if the samples were tested, there is not a "reasonable probability" that, if the specimens tested negative for fentanyl metabolite, Rossum could obtain post-conviction relief. *See Osborne*, slip op. at 3386. The presence or absence of fentanyl metabolite in the specimens is not dispositive of Rossum's innocence. Her only claim in this

regard is that counsel was ineffective for failing to test the specimens for fentanyl metabolite and that she was prejudiced by the failure.  This Court has already concluded, however, that counsel was not ineffective for failing to seek the testing and that Rossum was not prejudiced by this failure.  (*See* Report and Recommendation at Section IV(B)(4), (5).)  Accordingly the request for discovery is **DENIED**.

### 6.    *Request for an Evidentiary Hearing*

Rossum asks this Court to conduct an evidentiary hearing on the question whether trial counsels' decisions not to contest the prosecution's assertion that de Villers died from fentanyl poisoning and not to test the autopsy samples for fentanyl metabolite were reasonable strategic choices and whether she was prejudiced by any errors committed by counsel. (Petr's Req. for Evidentiary Hrg. and Disc. [doc. no. 11].)   Evidentiary hearings in 28 U.S.C. § 2254 cases are governed by the AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999).  The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (A) the claim relies on –
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (West 2006).

The Ninth Circuit has outlined the procedure for district courts to follow in determining whether to grant a request for an evidentiary hearing.  First, the Court must "determine whether a factual basis exists in the record to support the petitioner's claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005) (citing *Baja*, 187 F.3d at 1078).  If not, the Court must "ascertain whether the petitioner has 'failed to develop the factual basis of the claim in State court.'" *Id.*  A failure to develop the factual basis of a claim in state court implies "some lack of diligence, or some greater fault, attributable to the

prisoner or the prisoner's counsel." *See Williams*, 529 U.S. at 432.  The Supreme Court has said that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.  If the petitioner has failed to develop the factual basis for his claim in state court, "the court must deny a hearing unless the applicant establishes one of the two narrow exceptions set forth in section 2254(e)(2)(A) & (B)." *Insyxiengmay*, 403 F.3d at 669-70.

If, however, the petitioner "has not 'failed to develop' the facts in state court, the district court may proceed to consider whether a hearing is appropriate, or required under *Townsend [v. Sain,* 372 U.S. 293 (1963)]." *Id.*  The Court in *Townsend* identified six situations in which a habeas petitioner would be entitled to an evidentiary hearing:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that state trier of fact did not afford the habeas applicant a full and fair hearing.

*Townsend*, 372 U.S. at 313.

In sum, if a petitioner has not failed to develop the factual basis for his claim in state court, he is entitled to an evidentiary hearing in federal court if he meets one of the *Townsend* factors and makes allegations which, if true, would entitle him to relief.  *See Insyxiengmay*, 403 F.3d at 670; *see also Gonzalez v. Pliler*, 341 F.3d 897, 903 (9th Cir. 2003).

In order to determine whether Rossum is entitled to an evidentiary hearing on her claims, the Court must first decide whether there is a factual basis in the record to support the claims.  With respect to her claim that counsel was ineffective because they failed to investigate and present a defense based on a cause of death other than an overdose of fentanyl, namely an overdose of oxycodone and clonazepam, the Court concludes that a factual basis does not exist in the record to support her claim.  (*See* Report and Recommendation at Section IV(B)(4).)

Next, the Court must decide whether she has failed to develop the factual basis for that claim in state court.  As previously noted, Rossum submitted Dr. Richiemer's affidavit to the state supreme court as part of the habeas corpus petition she filed with contained this claim.  (*See* Lodgment No. 12, Ex. C.) She also asked for an evidentiary hearing on her claim that counsel was ineffective for failing to

investigate and pursue a defense based on an alternative cause of death.  (*See* Lodgment No. 12, at 63.)

Accordingly, even though she was denied an evidentiary hearing in state court, she has not failed to

develop the factual basis for this claim.  *Insyxiengmay*, 403 F.3d at 670.

The final step the Court must take to determine whether Rossum is entitled to an evidentiary

hearing is to decide whether she meets one of the *Townsend* factors and makes allegations, which if true,

would entitle her to relief.  *Id*.  Although some of the *Townsend* factors are present, Rossum has not

made allegations that, if true, would entitle her to relief.  As discussed above, Dr. Blackbourne

unequivocally stated that clonazepam did not kill de Villers and only a trace of oxycodone was found.

(Lodgment No. 2, vol. 8 at 526, 543-45.)  Dr. Richeimer's affidavit does not state that de Villers died

of an overdose of oxycodone and clonazepam rather than fentanyl, or even that it was more likely that

he did.  (*See* Pet'rs Ex. E.)  There is simply no evidence in the record before this Court that de Villers

died of anything other than a fentanyl overdose.  Moreover, since clonazepam and oxycontin were also

missing from the Medical Examiner's Office, there is not a reasonable probability, sufficient to

undermine confidence in the outcome of the trial, that had counsel presented a defense positing that de

Villers died of an overdose of oxycodone and clonazepam instead of fentanyl, the result of the

proceeding would have been different.  *Strickland*, 466 U.S. at 689, 694.

With respect to Rossum's claim that counsel was ineffective when they failed to investigate and

pursue a defense claiming that de Villers' autopsy specimens were contaminated with fentanyl, the

Court also concludes a factual basis does not exist in the record to support the claim.  *Insyxiengmay*, 403

F.3d at 669-70; *see also* Report and Recommendation at IV(B)(5).  Further, and for the same reasons

stated above, the Court concludes that Rossum did not fail to develop the factual basis for her claim in

state court because she submitted this claim, including Dr. Richeimer's affidavit, to the California

Supreme Court and requested an evidentiary hearing.  *See Insyxiengmay*, 403 F.3d at 670.

As with the preceding claim, although Rossum may meet some of the *Townsend* factors, her

allegations, even if true, do not entitle her to relief.  *See Insyxiengmay*, 403 F.3d at 670.  As discussed

in this Report and Recommendation at Section B(4) and (5), there is no credible evidence that de Villers

died of anything other than a massive overdose of fentanyl, Medical Examiner's Office employees

lacked a sufficient and believable motive to contaminate the specimens, Rossum had access at the

1   Medical Examiner's Office to the only other drugs founds in his system and those drugs, along with

2   fentanyl, were missing from the Medical Examiner's Office.  Under these circumstances, counsel's

3   decision not to test the specimens for fentanyl metabolite was reasonable.  *Strickland*, 466 U.S. at 687-

4   89.

5   For the foregoing reasons,  the Court **DENIES** Rossum's request for an evidentiary hearing as

6   to her claims.

7   7.    *Failure to Object to the Admission of Drug Use Evidence*

8   Next, Rossum argues that trial counsel should have objected to the admission of evidence of her

9   high school and college drug use (before she met de Villers) and her drug use after de Villers' death.

10   (Pet. at 7-7A; Pet'rs Mem. at 34-50.)  She claims the evidence was improperly admitted as character or

11   propensity evidence and that none of the evidence was relevant to prove any disputed fact or motive.

12   (*Id.*)   Respondents  argue  the  state  court's  denial  of  this  claim  was  neither  contrary  to,  nor  an

13   unreasonable application of, clearly established Supreme Court law.  (Resp'ts Mem. at 16-18.)

14   Rossum argues that the last reasoned state court decision to which this Court must look for its

15   analysis under *Ylst* is the California Supreme Court's silent denial of this claim because, although she

16   raised a similar claim in the habeas corpus petition she filed concurrently with her direct appeal, the

17   substance of her current claim was not contained in that petition but rather in a habeas corpus petition

18   she subsequently filed in the California Supreme Court.  She further argues that because the state court

19   did not furnish a basis for its reasoning, the Court must conduct an independent review of the record to

20   determine whether the denial was contrary to, or an unreasonable application of, clearly established

21   Supreme Court law, pursuant to *Himes*, 336 F.3d at 853.  (Pet'rs Mem. at 46-48.)

22   The Court has carefully examined the briefs filed in Rossum's direct appeal, including the habeas

23   corpus petition filed concurrently with the appeal.  There, Rossum alleged her attorneys were ineffective

24   for failing to object to the introduction of prejudicial evidence in the form of "uncharged crimes and

25   prior bad acts," specifically her teenage drug use.  (*See* Lodgment No. 6 at 61.)  Thus, to the extent the

26   current claim alleges trial counsel was ineffective when they failed to object to the admission of

27   Rossum's drug use before meeting de Villers, the last reasoned state court decision to which this Court

28   must look is the state appellate court's opinion denying the habeas corpus petition Rossum filed

1    concurrently with her direct appeal.  *See Ylst*, 501 U.S. at 801-06.  The Court must determine whether

2    the state appellate court's denial of the claim was contrary to, or an unreasonable application of, clearly

3    established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

4          The habeas corpus petition Rossum filed concurrently with her direct appeal, however, did not

5    contain the second portion of this claim which alleges trial counsel were ineffective for failing to object

6    to the admission of evidence of Rossum's drug use after de Villers' death.  (*See* Lodgment No. 6.)  Thus,

7    as to that portion of the claim, the California Supreme Court's silent denial of the claim on habeas

8    corpus review is the decision to which this Court must look to resolve this claim under *Ylst*.  The Court

9    must conduct an independent review of the record to determine whether the state court's denial of the

10   claim was contrary to, or an unreasonable application of, clearly established Supreme Court law.  *Himes*,

11   336 F.3d at 853.

12         a.    *Teenage Drug Use*

13         At trial, the prosecutor presented some evidence during his case in chief about Rossum's teenage

14   drug use from Jerome de Villers, the victim's brother, and Christopher Wren, de Villers' roommate at

15   the time de Villers met Rossum.  Jerome testified that Greg told them Rossum was trying to deal with

16   her methamphetamine addiction.  (Lodgment No. 2, vol. 16 at 1793.)  Wren testified that Rossum herself

17   told him she was addicted to methamphetamine.  (Lodgment No. 2, vol. 14 at 506.)  The prosecutor also

18   played a tape of Rossum's statement to police, which she gave about three weeks after de Villers' death.

19   In it, Rossum admitted to having a drug problem in the past.  (Lodgment No. 1, vol. 2 at 0411, 0418-19,

20   0427-28.)  She also admitted to using methamphetamine shortly before and after de Villers' death.  (*Id.*

21   at 0471-74.)

22         On rebuttal, Theodore Maya, Rossum's college boyfriend, testified that he saw Rossum about

23   two weeks after she disappeared from school in the fall of 1994 and that she looked like she was using

24   drugs.  (Lodgment No. 2, vol. 22 at 2876, 2881-82.)  Officer Lawrence Horowitz, who spoke to Rossum

25   as part of an investigation into the confrontation about drugs she had with her parents in the Spring of

26   1993, also testified on rebuttal.  He stated that Rossum told him she had been using crack.  (*Id.* at 2886-

27   87.)  He also testified that he came to the Rossum home on January 14, 1994 in response to Constance

28   Rossum's call to police.  Constance Rossum had reported that Rossum was on drugs.  (*Id.* at 2893.)  At

that time, Rossum appeared to be under the influence of a stimulant. (*Id.*)  Constance Rossum told Horowitz that Rossum's drug use had been going on for several years. (*Id.* at 2894, 2896-97, 2899-2900.)

The majority of the evidence of Rossum's drug use before and after de Villers' death, however, came during the defense case in the form of testimony from Rossum's parents and Rossum herself. Constance Rossum testified that Rossum's use of methamphetamine began in her junior year in high school and continued on and off throughout high school and college. (Lodgment No. 2, vol. 17 at 2051-61.)  She and her husband called the police on at least one occasion because of Rossum's behavior and drug use. (Lodgment No. 2, vol. 18 at 2123-24, 2141-43, 2148.)  During her first year at college, Rossum disappeared for about a month, during which time she met de Villers. (Lodgment No. 2, vol. 17. at 2052-58; vol. 18 at 2062-67, 2128-30, 2155-56.)  Ralph Rossum also testified about Rossum's drug use in high school and college. (*See* Lodgment No. 2, vol. 19 at 2311-22.)  He recounted when he met de Villers. (*Id.* at 2323-25, 2353-55, 2394-98, 2401-02.)  He also testified that Rossum began using drugs again after de Villers' death.  (*Id.* at 2387.)  Rossum herself recounted in detail her methamphetamine addiction, which began in high school and continued intermittently  until she was arrested for de Villers' murder. (*Id.* at 2422-50; vol. 20 at 2451-53, 2457-58, 2464-65, 2528-19, 2550-54; vol 21 at 2560-62, 2579, 2611, 2614-16, 2646-48, 2654-59, 2670, 2713-15; vol. 22 at 2833, 2846-47.)

The state appellate court concluded that counsel was not ineffective for failing to object to the "bad acts" evidence and that, in any event, the admission of the evidence did not prejudice her:

> In *People v. Riel* (2000) 22 Cal.4th 1153, 1185, the California Supreme Court explained that the failure to object to inadmissible evidence rarely constitutes ineffective assistance of counsel:
>
> > "'Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence.' [Citation] 'Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight . . . . A reviewing court will not second-guess trial counsel's reasonable tactical decisions.'"
>
> During opening statement, Rossum's trial counsel said that Rossum would be testifying at trial.  Her counsel therefore knew that much of the evidence pertaining to her prior bad acts would be admissible on cross-examination, for purposes of i  m  p  e  a  c  h  m  e  n  t  .

At trial, Rossum in fact admitted having committed many of the other crimes and bad cts. She admitted using drugs, taking money from her parents to buy drugs, taking a razor blade and dragging it across her wrists when she was a teenager, taking checks that belonged to de Villers's roommate [footnote omitted], having been fired from her job as a waitress due to "billing inaccuracies," and implying to her teenage boyfriend that she had been kidnapped in Mexico, in an effort to explain to him why she had left him so suddenly.

Rossum's trial counsel could have rationally concluded, as a tactical matter, that since much of the evidence of prior crimes and other bad acts would be admissible to impeach Rossum, it would be better to have some of that evidence come in through the testimony of Rossum's parents, rather than for the jury to hear it for the first time during Rossum's own testimony. In addition, Rossum's prior drug use was admissible to establish her motive for killing de Villers. The evidence of her commission of prior thefts was arguably also admissible to prove that she stole the drugs that were used to commit the murder.

(Lodgment No. 9 at 18-20.)

The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. Although the prosecution presented some evidence of Rossum's teenage drug use in their case in chief, the bulk of the testimony regarding her drug use case came during the defense case, which rested heavily on Rossum testifying in her own defense. Once the decision was made for Rossum to testify, as the state court found, it was well within counsels' reasonable, tactical decision-making role to elicit the facts surrounding her teenage drug use through the testimony of Rossum's parents and Rossum herself instead of waiting for the prosecutor to bring it up on cross-examination. It was also a reasonable, tactical decision to present as transparent a portrait as possible of Rossum in order to persuade the jury to believe her version of events. Refraining from objecting to the prosecution's exploration of her drug use was part of this reasonable, tactical decision.

Moreover, contrary to Rossum's argument, her prior drug use was admissible to show motive. Rossum was the one who told police that de Villers threatened to reveal her drug *history* to the Medical Examiner's Office. (Lodgment No. 1, vol. 2 at 0427.) She later admitted that she had resumed using methamphetamine at the time of de Villers' death and that de Villers had discovered this. (*Id*. at 0479.) The extensive and continuing nature of Rossum's drug history was relevant to, and provided a strong basis for, her motive to kill de Villers because it made it more likely that Rossum knew the disclosure of a lengthy drug history combined with a resumption of drug use would lead to her termination from the Medical Examiner's Office and could even have led to the cessation of her career as a toxicologist.

In any event, Rossum has not established she was prejudiced by her attorneys' failure to object to the drug use evidence because there was strong evidence of Rossum's guilt. The autopsy concluded that de Villers died from extraordinarily high levels of a highly regulated drug, fentanyl, in his system. Fentanyl was missing in large quantities from Rossum's place of work. De Villers had apparently discovered only days before his death that Rossum was involved in an extramarital affair with her boss and was using methamphetamine, and may have threatened to reveal Rossum's misdeeds. Rossum's claim that de Villers had taken her old medications was strongly contradicted by members of family and friends, who testified that de Villers never took any drugs, legal or illegal. The death scene at de Villers' apartment appeared to be staged with red rose petals and a wedding photograph, and Rossum purchased a rose the day of de Villers' death, although she claimed it was yellow. (Lodgment No. 2, vol. 22 at 2852-53.) Thus, Rossum has not established that, given the strength of the prosecution's case, the result of her trial would have been different had counsel objected to the drug use evidence. *Strickland*, 466 U.S. at 694; *Luna*, 306 F.3d at 966.

### b.    *Drug Use After de Villers' Death*

The prosecution presented limited evidence regarding Rossum's drug use after de Villers' death. Detective Laurie Agnew, who arrested Rossum and searched her apartment on January 4, 2001, two months after de Villers' death, testified that Rossum told her that police would find methamphetamine and drug paraphenalia during their search, which they did. (Lodgment No. 2, vol. 15 at 1705-07.) Blood and urine tests conducted on Rossum after her arrest showed she was under the influence of methamphetamine. (*Id.* at 1722.) Meredith Dent, a legal assistant for the District Attorney's Office, testified that Rossum's cell phone records showed four calls to Mexico early on the morning of de Villers' death, which Rossum later confirmed were calls to her methamphetamine supplier. (Lodgment No. 12, vol. 14 at 1632-33; vol 21 at 2579-80.) Dent also testified that records of Rossum's ATM withdrawals coincided with her phone calls to her drug dealer. (Lodgment No. 2, vol. 14 at 1645-48; vol. 15 at 1649-53.) During her testimony, Rossum admitted to using methamphetamine intermittently after de Villers' death. (Lodgment No. 2, vol. 21 at 2645-49, 2617-18, 2657-59; vol. 22 at 2833.)

Although the evidence of her continuing drug use after de Villers' death was less relevant to contested issues in the case, viewing counsels' performance through the highly deferential lens required

by *Strickland*, the Court cannot say that "counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment" when they failed to object to this evidence. *See Strickland*, 466 U.S. at 668, 687. Counsels' strategy was to acknowledge that while Rossum was a deeply flawed individual who had a methamphetamine addiction and had conducted an extramarital affair, she was not capable of murder. Based on an independent review of the record, the Court finds that counsel could have reasonably concluded that objecting to evidence of her drug use would have alienated the jury by making it appear that counsel was attempting to hide things from the jury. Given the strength of the prosecution's case, moreover, Rossum has not demonstrated a reasonable probability, sufficient to undermine confidence in the outcome, that the result of the proceedings would have been different had counsel objected to the references to Rossum's drug use after de Villers' death. *See Strickland*, 466 U.S. at 694; *Luna*, 306 F.3d at 966.

### 8. *Failure to Request a Limiting Instruction*

Rossum also faults counsel for failing to request a jury instruction which would have told the jury they could not use the "bad act" evidence as evidence of her guilt. (Petr's Mem. at 45-50.) Respondents counter that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Respotted's Mem. at 16-18.)

Rossum raised this claim in the habeas corpus petition she filed concurrently with her direct appeal. (*See* Lodgment No. 6.) Thus, the state court appellate court's denial of that petition is the decision to which this Court must look for its analysis. *Ylst*, 501 U.S. at 801-06. That court said:

> Defense counsel did not request that the trial court instruct the jury, pursuant to CALJIC No. 2.50[2], that it was not to consider Rossum's commission of any uncharged offenses or bad acts as evidence of her criminal disposition. The decision not to request such an instruction did not constitute ineffective assistance of counsel.

> For the reasons discussed above, contrary to Rossum's claims, the bad acts evidence was not "central to the prosecution theory of the case." Indeed, as noted by Rossum in her petition, "most of the evidence did not even appear in the prosecution case-in-chief." Further, there was little chance the jury would consider the evidence of uncharged offenses as proof that Rossum had a disposition to commit crimes, and therefore, that she had murdered de Villers, since none of the evidence of prior bad acts remotely suggested that Rossum was predisposed to commit the crime of murder.

> In addition, much of the evidence at issue was relevant to prove Rossum's motive for committing the murder. The People's theory was that Rossum murdered de Villers

---

[2] "CALJIC" refers to California Jury Instructions, Criminal.

to prevent him from informing her employer of her affair with Robertson and her methamphetamine use, as he had threatened to do.  CALJIC No. 2.50 expressly states that evidence of prior bad acts can be used to prove "the motive for the commission of the crime charged."  (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1088 [citing CALJIC No. 2.50 and concluding counsel did not provide ineffective assistance in failing to request limiting instruction where "instruction on use of this testimony properly might explain how it *could* be used as well as how it could not be used."].)  Thus, there was a risk that instructing the jury pursuant to CALJIC No. 2.50 would highlight the relevance of the prior bad acts in establishing Rossum's motive to murder de Villers.  "'A reasonable attorney may have tactically concluded that the risk of a limiting instruction . . .outweighed the questionable benefits such instruction would provide.' [Citation.]" (*Hernandez*, *supra*, 33 Cal.4th at p. 1088.)

(Lodgment No. 9 at 21-22.)

The state court correctly concluded that counsels' failure to request a limiting instruction did not constitute ineffective assistance.  As the state court noted, the prosecution's case was based on a contention that de Villers' threatened revelation of Rossum's drug use and her affair with her boss were what prompted Rossum to kill him.  Accordingly, the state court was correct in stating that the jury would have been able to consider much of the drug use evidence to show motive even if CALJIC No. 2.50 had been given.  And, the state court also properly concluded that trial counsel could have reasonably decided that CALJIC No. 2.50 would only have highlighted for the jury to what use the drug use evidence could have been put.  In any event, there was strong evidence of Rossum's guilt and, given the strength of the prosecution's case, she has not shown a reasonable probability, sufficient to undermine confidence in the outcome, that the result of her trial would have been different had counsel requested the jury be instructed with CALJIC No. 2.50.  *Strickland*, 466 U.S. at 694; *Luna*, 306 F.3d at 966.

9.      *Failure to Object to Statements Made by the Prosecutor During Opening and Closing Arguments*

Rossum also suggests in passing that counsel should have objected to the prosecutors' reference to her drug use in their opening and closing statements.  (Pet'rs Mem. at 44.)  This claim was raised in the habeas corpus petition Rossum filed in the California Supreme Court, which that court denied without citation of authority.  (*See* Lodgment Nos. 12, 13.)  Accordingly, the Court must conduct an independent review of the record to determine whether the state court's denial of the claim was contrary to, or an unreasonable application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.

1    Rossum does not elaborate on exactly what objections could or should have been made to the

2    prosecution's arguments.  The prosecutor explicitly linked the drug use evidence to his theory of

3    Rossum's motive, and specifically stated that the drug use evidence was not presented "just to dirty her

4    up."  (Lodgment No. 23 at 2967–68, 2972-74.)   In the context of the trial, these were reasonable

5    inferences drawn from the evidence presented at the trial.  *See Darden v. Wainwright*, 477 U.S. 168,

6    181-82 (1986) (stating that a prosecutor may argue reasonable inferences based on the evidence); *see*

7    *also Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996) (quoting *United States v. Baker*, 10 F.3d

8    1374, 1415 (9th Cir. 1993) and stating that "counsel are given latitude in the presentation of their closing

9    arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented

10   and all reasonable inferences therefrom").  Accordingly, it was not unreasonable for counsel to fail to

11   have objected to them, nor is it likely the objections would have been sustained.  *Strickland*, 466 U.S.

12   at 668, 687.

13        Rossum also argues counsel should have objected to the prosecutor's statement during closing

14   argument that Dr. Stump testified that methamphetamine makes people violent.  (Pet'rs Mem. at 43.)

15   It is true that Dr. Stump did not testify that methamphetamine makes people violent, but even if counsel

16   erred by failing to object to this statement, there is no evidence Rossum was prejudiced by such a brief

17   reference in a lengthy closing argument, particularly in light of the strength of the prosecution's case.

18   *Strickland*, 466 U.S. at 687-94; *Luna*, 306 F.3d at 966.

19        10.    *Failure to Object to the Testimony of Dr. Stump*

20        Rossum also claims counsel should have objected to the testimony of Dr. Stump, who Rossum

21   refers to as a "'self-educated' methamphetamine expert."  (Pet'rs Mem. at 36, 39, 43-44.)  As with the

22   preceding claim, the last reasoned state court decision to which this Court must look for its analysis is

23   the California Supreme Court's denial without citation of authority of Rossum's habeas corpus petition.

24   (*See* Lodgment Nos. 12, 13.)  Accordingly, the Court must conduct an independent review of the record

25   to determine whether the state court's denial of the claim was contrary to, or an unreasonable application

26   of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.

27        Rossum does not specify upon what grounds counsel should have objected to Dr. Stump's

28   testimony, but it appears she believes that because her drug history and drug use after de Villers' death

were irrelevant, Dr. Stump's testimony was also irrelevant.  As this Court has concluded, however, Rossum's drug use prior to de Villers' death was relevant to establish motive, which in turn makes Dr. Stump's testimony relevant and admissible. (*See* Report and Recommendation at IV(B)(7.)  In addition, Dr. Stump testified about how long-term methamphetamine addiction affects a person's mental faculties and decision-making abilities, resulting in paranoia and extremely poor judgment. (*See* Lodgment No. 2, vol. 10 at 808, 812-13.)  This was relevant to support the prosecution's contention that Rossum's continuous and lengthy methamphetamine addiction was part of the reason she decided to murder de Villers.  Accordingly, trial counsel was not ineffective for failing to object to Dr. Stump's testimony as it appears there was no ground upon which counsel could have based such an objection. *Strickland*, 466 U.S. at 668, 686.

11.      *Cumulative Error*

Finally, Rossum claims that the cumulative effect of counsels' errors deprived her of the effective assistance of counsel in violation of her Sixth Amendment rights.  (Pet'rs Mem. at 50-52.) "Although no single alleged error may warrant habeas corpus relief, the cumulative effect of errors may deprive a petitioner of the due process right to a fair trial." *Karim v. Calderon*, 283 F.3d 1117, 1132 (9th Cir. 2002).  As discussed in this Report and Recommendation, the Court has found no errors committed by counsel and has concluded that Rossum did not suffer any prejudice from any alleged errors. (*See* Report and Recommendation at Section B.)  Thus, she did not suffer any cumulative effect from counsels' errors, and the state court's denial of this claim is neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.  Rossum is not entitled to relief as to this claim.

**V.      CONCLUSION AND RECOMMENDATION**

The Court submits this Report and Recommendation to Chief United States District Judge Janis L. Sammartino under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California. For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order:  (1) approving and adopting this Report and Recommendation, (2) directing that Judgment be entered denying the Petition, (3) denying Petitioners' request for an evidentiary hearing and (4) denying Petitioner's request for discovery.

07cv1590

**IT IS ORDERED** that no later than **June 16, 2008,** any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **June 30, 2008**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  May 16, 2008

Jan M. Adler
U.S. Magistrate Judge

07cv1590