# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| KRISTIN ROSSUM, | CASE NO. 07-CV-1590-JLS (JMA) |
|---|---|
| Plaintiff, | **ORDER: (1) ADOPTING IN FULL THE CONCLUSIONS OF THE REPORT AND RECOMMENDATION, (2) ADOPTING IN PART THE REASONING OF THE REPORT AND RECOMMENDATION, AND (3) DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| vs. | |
| L.E. SCRIBNER, et al., | |
| Defendants. | (Doc. No. 12.) |

Presently before the Court is Kristin Rossum's ("Petitioner") petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) Petitioner claims that she was denied effective assistance of counsel.

The matter was referred to United States Magistrate Judge Jan M. Adler, pursuant to 28 U.S.C. § 636(b)(1)(B). On May 16, 2008, Magistrate Judge Adler issued a Report and Recommendation ("R&R"), concluding that this Court should dismiss the petition on the merits, deny petitioner's request for an evidentiary hearing, and deny petitioner's request for discovery. (Doc. No. 12 ("Report").) On July 16, 2008, petitioner filed objections to the R&R. (Doc. No. 16.) This Court has considered all relevant materials, and, for the reasons set forth below, the Court **ADOPTS IN FULL** the R&R's conclusions, **ADOPTS IN PART** the R&R's reasoning, and **DISMISSES** the petition.

**BACKGROUND**

In habeas corpus proceedings instituted under 28 U.S.C. § 2254, "a determination of a factual issue made by a state court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Petitioners bear the burden of rebutting this presumption by "clear and convincing evidence." Id. Petitioner has not objected to the state court characterization of the facts. (See Report, at 2–4; Lodgment No. 8, at 3–7.) Therefore, this order incorporates by reference the factual summaries contained within the R&R. (Report, at 2–5, 7–10; see also Lodgment No. 8, at 3–7.) For purposes of clarity, however, this Court will provide a brief overview of the relevant facts.

Petitioner met the victim, Greg de Villers, in 1995. (Lodgment No. 8, at 3.) At the time, she was addicted to methamphetamine and living in a motel room in Chula Vista. (Id.) De Villers helped petitioner stop using methamphetamine, and the two were married in 1999. (Id.) On November 2, 2000, de Villers told petitioner of his suspicions that she had resumed using methamphetamine and was having an extramarital affair. (Id. at 4.) He "threatened to reveal her drug use and her affair . . . to [her] employers if she refused to quit her job." (Id.) On November 6, 2000, de Villers died. (Id., at 5.) According to Petitioner, he had spent the entire day at home and "out of it." (Id. at 4–5.)

San Diego County Medical Examiner Dr. Brian Blackbourne performed de Viller's autopsy. He found five needle marks on de Villers' body. (Lodgment No. 2, vol. 8 at 520.) Paramedics and the emergency room doctor caused four of those marks, but no explanation was provided as to the fifth. (See Lodgment No. 2, vol. 12, at 1248, 1266 & 1269.) Normally, the specimens from de Viller's autopsy would have been tested by the Medical Examiner's Office. However, because he was married to Petitioner, who was employed as a toxicologist by the Medical Examiner's Office, the specimens were instead sent to an outside testing facility. (Lodgment No. 2, vol. 8 at 521.)

The transfer of the specimens, however, was less than smooth. The sheriff's department employee, Frank Barnhart, who was supposed to take custody of the specimens immediately following the autopsy, was unable to do so. (Id. at 521.) Thus, the decision was made to transport the samples back to the Medical Examiner's office and hold them there in a refrigerator for about thirty six hours. (Id.) The specimens were then transported to the sheriff's crime lab and turned over to Mr. Barnhart. (Id.) Notably, all toxicologists who worked at the Medical Examiner's Office had a key for the

1  building which would allow them to enter during off hours. (Id. at 442.)

2  The toxicology tests on the autopsy specimens revealed large quantities of the drug fentanyl in de Villers' stomach contents, blood, urine, peripheral blood, antemortem blood, and forearm tissue.[1] (Id. at 524–25 & 555–56.) According to the testimony of Dr. Theodore Stanley, an expert in anesthetic drugs, fentanyl is a pain reliever and anesthetic that can cause unconsciousness, slowed or stopped breathing and death when taken in too large a quantity.[2] (Lodgment No. 2, vol. 9 at 632–34.) Fentanyl is tasteless and can be administered orally or intravenously, or through a dermal patch. (See id., at 635–35 & 670.) In the quantities found in Mr. de Viller's samples, Dr. Stanley testified, fentanyl would render a person unconscious and probably stop their breathing. (Id., at 646–69 & 663.) Dr. Stanley opined that, given this massive amount of fentanyl, it is likely that the drug entered Mr. de Villers' system in multiple ways. (See id., at 651–52 & 658–59.) The effects of this sort of dose would be evident in, at most, twenty to thirty minutes and would lead, within an hour, to "profound decreases in respiratory rate," and "periods of apnea."[3] (Id., at 660.)

The discovery of fentanyl in de Villers' samples prompted an audit of the drugs stored at the Medical Examiner's Office. (Lodgment No. 2, vol. 8 at 401–16.) That audit found that fifteen fentanyl patches of various strengths and ten milligrams of liquid fenanyl were missing. (Id.) Petitioner had "logged in" the missing liquid fentanyl and the missing patches all came from cases on which Petitioner had worked. (Id.) Thus, on November 6, 2001, Petitioner was charged with murdering de Villers by poison. (See Report, at 7.)

According to Dr. Blackbourne's testimony at trial, he believed that, based on levels of lung congestion and the amount of urine in his bladder, de Villers had been "out of it" for about fourteen hours before he died. (Lodgment No. 2, vol. 8 at 519.) He also testified that, in his opinion, Mr. de Villers died of acute fentanyl intoxication. (Id., at 525.) The parties stipulated to the levels of

---

[1] The test results also indicated that de Villers' system also contained a very small amount of oxycodone and some clonazepam. (Lodgment No. 2, vol. 8, at 543–44.)

[2] According to Dr. Stanley, fentanyl, like other opioids, will also inhibit a person from remembering to empty their bladder.

[3] Fentanyl also has a "synergistic effect," that is, it has a far greater effect when combined with other drugs. (Lodgment No. 2, vol. 9, at 642.)

1  fentanyl found in de Villers' autopsy samples. (Id., at 525–26.)

2  In November, 2002, a jury found Petitioner guilty of first degree murder. (Report, at 4.) She was sentenced to prison for life without the possibility of parole. (Id.) Petitioner appealed her conviction and filed a concurrent petition for writ of habeas corpus in the California Court of Appeal for the Fourth Appellate District, Division One. (See Lodgement Nos. 3 & 6.) Petitioner's conviction was upheld, and her habeas petition was denied. (See Lodgement Nos. 8 & 9.) Petitioner then filed an appeal and a petition for habeas corpus with the California Supreme Court, both of which were summarily denied. (See Lodgment Nos. 10, 11, 12 & 13.) On August 10, 2007, Petitioner filed the instant habeas corpus petition before this Court. (Doc. No. 1.) On November 13, 2007, Respondent filed an answer, (Doc. No. 8) and on December 21, 2007, Petitioner filed a traverse. (Doc. No. 9.) Magistrate Judge Adler issued his R&R on May 16, 2008, to which Petitioner filed objections on July 16, 2008. (Doc. No. 16.)

**LEGAL STANDARD**

**A.    Review of Habeas Corpus Petitions Under § 2254**

The R&R sets forth the appropriate standard of review under § 2254. (Report, at 5–6.) This Court may grant Petitioner's section 2254 petition only if the Court determines that the final "reasoned state judgment" is either "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 403, 412–13 (2000). In this case, because the California Supreme Court summarily rejected petitioner's claims, the Court "looks through" to the appellate court's decision. Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991). Where "the state court supplies no reasoned decision," the Court must "perform an 'independent review of the record' to ascertain whether the state court decision was objectively unreasonable. Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003) (quoting Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by Lockyer v. Andrade, 538 U.S. 797 (2003)). Finally, pursuant to 28 U.S.C. § 636(b)(1),

the Court reviews *de novo* those portions of the Report to which Petitioner objects.

**B.     Review of Ineffective Assistance of Counsel Claims**

As properly found by Magistrate Judge Adler, the Court reviews ineffective assistance of counsel claims under the standard set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). (See Report, at 7.) "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This determination has two components. First, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness," or "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. at 687–88. The Court should not ask what petitioner's counsel could have done, or whether "another lawyer, with the benefit of hindsight, would have acted differently," but rather whether petitioner's counsel's choices were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998). "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 8 (2003). Moreover, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

Next, "the [petitioner] must show that the deficient performance prejudiced the defense," and "deprive[d] the [petitioner] of a fair trial, a trial whose result is reliable." Id. at 687. To satisfy this prong, "[t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

To demonstrate ineffective assistance of counsel, petitioner must satisfy both parts of the Strickland test, because unless she "makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687. However, if petitioner can show that she was denied effective assistance of counsel, she also will satisfy her burden under § 2254 of showing that the state court decision was "contrary to . . . clearly established federal law, as determined by the Supreme Court of the United States." See 28 U.S.C. §

2254(d), <u>Baylor v. Estelle,</u> 94 F.3d 1321, 1325 (9th Cir.1996).

## ANALYSIS

Petitioner makes three main arguments in support of her claim that she was denied effective assistance of counsel. First, Petitioner argues that she did not receive effective assistance of counsel because her counsel failed to investigate two potential defenses: challenging the cause of death proffered by the prosecution and arguing that laboratory specimens became contaminated prior to testing. (Petition, at 6–6A.) Next, Petitioner claims that her counsel's failure to object to certain evidence denied her effective assistance of counsel. (<u>Id.</u>, at 7.) Finally, petitioner argues that even if her counsel's errors individually did not violate her Sixth Amendment right to counsel, cumulatively they render her counsel's performance constitutionally inadequate. (<u>Id.</u>, at 8.)

Petitioner's objections reiterate these arguments and discuss alleged errors in the R&R's analysis. Because Petitioner has raised objections to the R&R, the Court reviews its conclusions *de novo*. 28 U.S.C. § 636(b)(1). As discussed below, the Court finds that Petitioner's claims are without merit, and therefore **DENIES** the present petition.

### A.     Petitioner's Failure to Investigate Arguments

Petitioner argues that her counsel was constitutionally ineffective for failing to investigate two defenses to the charges against her. First, petitioner claims that her counsel unreasonably failed "to investigate a defense based on challenging the prosecution's claim as to the cause of death."[4] (<u>Id.</u>, at 6.) Second, petitioner asserts that it was unreasonable for her counsel "to [not] investigate a contamination defense before conceding fentanyl was the cause of death." (<u>Id.</u>, at 6A.) According to Petitioner, the evidence strongly indicates that fentanyl was not actually the cause of de Villers' death. (Memo. ISO Petition, at 22.) Thus, Petitioner concludes that any reasonable defense would have to investigate whether to challenge the prosecution's theory as to the cause of death and investigate a contamination defense. (<u>Id.</u>, at 29.)

Petitioner lists various alleged facts which she claims support this conclusion. First, Petitioner

---

[4] Petitioner claims that the R&R misapprehended her first claim. (<u>See</u> Objections, at 4–5.) Although the R&R did not focus on Petitioner's precise first claim, it answers the claims as set forth in Petitioner's memorandum in support of her petition, such as the claim that "clonazepam and oxycodone" caused de Villers' death. (<u>See, e.g.</u>, Memo. ISO Petition, at 29.)

claims that the finding that de Villers was "breathing abnormally or not fully conscious for a period of 6 to 12 hours prior to his death," is inconsistent with the "extraordinarily high" level of fentanyl in de Villers' system and the quick onset of the drug's effects. (Id., at 23.) Regardless of whether fentanyl was administered intravenously, intramuscularly, or orally, she argues that death would have occurred within, at most, "an hour or two." (Id., at 24.) Second, the "differing concentration levels between the stomach and blood specimens also suggested fentanyl was not the cause of death and that it was not administered to de Villers." (Id., at 25.) Third, the "evidence suggesting fentanyl could not have been the cause of death, and the inability to identify a method of administration that would be [able to] produce the different concentration levels, suggested that the concentration levels of fentanyl were the result of contamination of the specimens." (Id.) Fourth, the "significant difference[s] in the concentration levels detected in the specimens of the same type . . . suggested their integrity might have been compromised." (Id., at 25–26.) Fifth, Petitioner claims that "the 36 hour failure to establish a chain of custody for the specimens" explains how "the integrity of the specimens could have been compromised and become contaminated." (Id., at 26.) Sixth, "there was evidence of bias and animosity against Robertson and Petitioner that would be consistent with" someone "contaminat[ing] or spik[ing] the samples." (Id., at 27.) Finally, "an alternative cause of death . . . was suggested by the evidence—that it was caused by clonazepam and oxycodone." (Id., at 28.)

Respondent challenges Petitioner's arguments, claiming that "there is nothing to support . . . a claim" of an alternate cause of death. (Answer, at 14.) Respondent claims that Petitioner has not "set forth any evidence that the victim's death was caused by anything other than fentanyl" or that de Villers' samples were "contaminated in some unexplained way."[5] (Answer, at 14.) In making this argument, Respondent asserts that Dr. Richeimer's declaration is unhelpful because it does not discuss the stolen fentanyl or "consider[] the possibility of multiple administrations." (Id.) Next, Respondent argues that "testing for . . . metabolites 'is commonly done by many laboratories,'" and "Petitioner presents no evidence that the victim's autopsy specimens were not already tested for the presence of

---

[5] The Court construes Respondent's statement that "Petitioner has utterly failed to set forth any evidence . . . that the fentanyl used in this murder was contaminated in some unexplained way." In the context of this case, this claim is nonsensical. There has been no allegation that the fentanyl was contaminated. Therefore, the Court construes Respondent to argue that Petitioner has not offered any evidence that de Villers' autopsy specimens were contaminated by fentanyl.

1  metabolites." (Id., at 15.) Further, Respondent disputes that Petitioner has offered any reasonable
2  theory as to an alternative cause of death. (Id.) The key, according to Respondent, is that there is
3  "overwhelming and indisputable evidence" that fentanyl was the cause of death. (Id., at 15.) "Good
4  trial tactics demand complete candor with the jury, and there was no evidence or any reasonable basis
5  for counsel to . . . challeng[e] fentanyl poisoning as the cause of the victim's death in this case, which
6  was overwhelmingly established by the mountain of evidence presented." (Id.)

7  Petitioner first raised these claims in her habeas corpus petition to the California Supreme
8  Court. (See Lodgment Nos. 12 & 13.) That court, however, summarily denied the petition.
9  (Lodgment No. 13.) As Magistrate Judge Adler correctly identified, that summary denial means that
10 there is no reasoned lower court decision for this Court to review. (See R&R, at 11–12.) Therefore,
11 this Court must independently review the record to determine whether the state court's denial of
12 Petitioner's claim was contrary to, or an unreasonable application of, clearly established Supreme
13 Court law. See Himes, 336 F.3d at 853.

14 The burden of proof on Petitioner to prove that her counsel was constitutionally defective is
15 heavy indeed. The standard by which this Court assesses counsel's reasonableness is "highly
16 deferential" because of the "strong presumption that counsel's conduct falls within the wide range of
17 reasonable professional assistance." Strickland, 466 U.S. at 689. This means that Petitioner must
18 show that her "counsel made errors so serious that counsel was not functioning as 'counsel'
19 guaranteed the defendant by the Sixth Amendment," not simply that "another lawyer, with the benefit
20 of hindsight, would have acted differently." Babbit, 151 F.3d at 1173 (quoting Strickland, 466 U.S.
21 at 689). This standard does not require counsel's performance to be perfect in order to be
22 constitutionally reasonable. Yarborough, 540 U.S. at 8.

23 Trial counsel has a "duty to make reasonable investigations or to make a reasonable decision
24 that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. "Strategic choices
25 made after thorough investigation of law and facts relevant to plausible options are virtually
26 unchallengeable; and strategic choices made after less than complete investigation are reasonable
27 precisely to the extent that reasonable professional judgments support the limitations on
28 investigation." Id., at 690–91. This duty requires adequate investigation into evidence "that

1  demonstrate[s] factual innocence, or that raise[s] sufficient doubt on that question to undermine
2  confidence in the verdict." Bragg, 242 F.3d at 1088 (citing Hart v. Gomez, 174 F.3d 1067, 1070 (9th
3  Cir.1999)).  To prove this type of claim, Petitioner must show what information would have been
4  obtained with further investigation, and whether, assuming the evidence is admissible, it would have
5  produced a different outcome at trial.  Hamilton v. Vasquez, 17 F.3d 1149, 1157 (9th Cir. 1994).
6  However, "the duty to investigate and prepare a defense is not limitless," Hendricks v. Calderon, 70
7  F.3d 1032, 1040 (9th Cir.1995) (citations and quotations omitted), and the Court must evaluate
8  ineffective assistance claims "in light of the strength of the government's case." Eggleston v United
9  States, 798 F.2d 374, 376 (9th Cir. 1986).

10       The Court finds that Petitioner's counsel acted reasonably.  Although Petitioner makes seven
11 claims which she argues demonstrate that the failure to investigate was unreasonable, they essentially
12 boil down to the contention that a fentanyl overdose is inconsistent with the evidence in this case.
13 (See Memo. ISO Petition, at 23–28.)  Nonetheless, these inconsistencies do not change the fact that
14 the evidence presented against Petitioner clearly and strongly supports the finding that fentanyl caused
15 de Villers' death.  Petitioner's counsel's decision not to challenge those facts was a reasonable
16 exercise of trial strategy.

17       All of the facts which Petitioner presents to this Court are, at best, equivocal in demonstrating
18 that fentanyl was not the cause of death.  In assessing these facts, Dr. Stanley's trial testimony is
19 illuminating.  First, the symptoms preceeding de Villers' death, such as abnormal breathing and
20 generally being "out of it," are the types of symptoms which Dr. Stanley described as typically
21 resulting from the administration of fentanyl. (Lodgment No. 2, vol. 9 at 634, 644–45 & 658.)  He
22 also testified that because the levels of fentanyl in blood and tissue samples were so high, the drug was
23 probably administered to de Villers in several different forms.  (See, e.g., id., at 651.)  Dr. Stanley
24 further explained that the transdermal patch takes about sixteen hours to reach its peak effect. (Id., at
25 655.)  It is clear that he was aware of the unusually high levels of fentanyl in de Villers' body. (See,
26 e.g., id., at 659.)  In spite of this awareness, Dr. Stanley's explanations for these fentanyl levels never
27 hinted at contamination or other source of the drug.

28       Further facts from trial support this conclusion.  For example, substantial amounts of fentanyl

was missing from the Medical Examiner's Office and Petitioner was involved in all of the relevant cases. (Lodgment No. 2, vol. 8 at 401–16.) Similarly, the unexplained needle mark on de Villers' body points towards some sort of drug administration. (See Lodgment No. 2, vol. 8 at 520; Lodgment No. 2, vol. 12, at 1248, 1266 & 1269.) Moreover, Petitioner herself testified that she believed that de Villers' death occurred because he "voluntarily took *fentanyl*, clonazepam, and oxycodone." (Lodgment No. 2, vol. 21, at 2569 (emphasis added).) In light of the facts at trial, Petitioner's testimony, and Dr. Stanley's testimony, it was not unreasonable for Petitioner's counsel to decline to challenge the prosecution's claim that fentanyl was the cause of de Villers' death.

Each of Petitioner's arguments to the contrary are unavailing because they depend on a theory of a single fentanyl administration, or single form of administration. For example, Dr. Reicheimer states that "[if] very high doses are rapidly administered, then death would likely occur rapidly . . . [but] if the fentanyl absorbed gradually . . . then it would be unexpected for the victim to survive long enough for the blood levels to reach the extremely high levels that were found in the decedent." (Reicheimer Decl. ¶ 8.) What this does not discuss is whether, as Dr. Stanley testified, this result could occur through multiple administrations of fentanyl in different forms. As elicited at trial, de Villers' time spent "out of it" is consistent with the application of transdermal fentanyl patches. (See Lodgment No. 2, vol. 9 at 658.) Moreover, the contents of de Villers' stomach indicated that he had ingested substantial amounts of fentanyl orally. (Id., at 659.) Although the evidence may be inconsistent with a single administration of fentanyl, as Petitioner claims, it is quite consistent with the trial testimony that de Villers received multiple doses of fentanyl in different forms. As the R&R states, "[i]n the face of strong evidence supporting [the conclusion that fentanyl caused de Villers' death], contesting the cause of death would not have advanced Rossum's defense in any measurable way." (Report, at 13 (citing Strickland, 466 U.S. at 668–69).) Petitioner's counsel cannot be said to have acted unreasonably in light of such clear evidence that fentanyl was the cause of death and that reasonable explanations existed for the high levels in the victim's system.

Petitioner also claims that contamination of de Villers' autopsy specimens is a better explanation for the extremely high levels of fentanyl and that her trial counsel was unreasonable for failing to investigate such a defense. (Memo. ISO Petition, at 26–28.) This argument, however, is

little more than speculation. Her counsel was not unreasonable for failing to pursue it. Petitioner recognizes that there was only a thirty-six hour window, when the samples were stored at the Medical Examiner's office, during which the specimens could have been contaminated. (Id., at 26–27.) The culprit would have to have been someone with "bias and animosity against Robertson and Petitioner," and access to the specimens—i.e. Petitioner's toxicologist coworkers. (Id., at 27.) This theory, however, is self-defeating. At the time that de Villers' samples were housed at the Medical Examiner's office, there was no plan to screen them for fentanyl because there was no indication that fentanyl was present. (See Lodgment No. 2, vol. 8 at 522–25.) Only when Frank Barnhart at the Sheriff's office requested a comprehensive drug screen *after* the specimens had been transported was there any possibility that fentanyl would be detected within the victim's system.[6] (See Lodgment No. 2, vol 12 at 1277–81.)

Similarly, Petitioner's evidence of bias supporting this accusation is weak at best. The Medical Examiner's employees were concerned that Petitioner might receive favorable treatment because of her relationship with Dr. Robertson. (Lodgment No. 2, vol 8 at 463.) This falls far short of the kind of motivation that would cause someone to go to the extreme of stealing fentanyl and trying to frame Petitioner for her husband's murder. As Magistrate Judge Adler properly found, "none of the Medical Examiner's employees expressed antipathy toward [Petitioner] sufficient to credibly support a defense that they would take the extreme measure of stealing fentanyl from the Medical Examiner's Office and attempting to frame [Petitioner] for de Villers' murder by contaminating [his] autopsy specimens with fentanyl." (Report, at 16.) Petitioner's counsel was not required to make this argument because "[a]n attorney is not required to argue a claim that is clearly refuted by the record." Cuffle v. Goldsmith, 906 F.2d 385, 388 (9th Cir. 1990).

It is also worth remembering Petitioner's testimony at trial that she believed de Villers "voluntarily took fentanyl, clonazepam, and oxycodone." (Lodgment No. 2, vol. 21, at 2569.) Her counsel's decision to eschew accusing her coworkers was plainly reasonable because it would flatly contradict Petitioner's testimony.

---

[6] Dr. Richeimer's opinion that contamination is a "better" explanation for the fentanyl in these samples is unpersuasive because, as discussed above, he does not discuss the possibility of multiple administrations in different forms. (Richeimer Decl. ISO Pet. ¶ 9; Objections, at 7.)

As discussed both above and at length in the R&R, challenging the prosecution's cause of death or arguing that the specimens were contaminated were unlikely to be successful trial strategies. Thus, a "highly deferential" review of counsel's performance indicates that Petitioner's counsel acted in a reasonable manner. Petitioner was therefore not denied effective assistance of counsel at trial.

Moreover, as Magistrate Judge Adler found, even if Petitioner could show that her counsel's choices were unreasonable, she cannot show the prejudice necessary to warrant relief. To establish this ineffective assistance of counsel claim, Petitioner must demonstrate prejudice, that is, that she was "deprive[d] . . . of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. In this case, Petitioner cannot do so. She was not prejudiced by her counsel's failure to investigate a defense based on challenging the prosecution's cause of death. Had her counsel attempted to set forth a different cause of death, such as oxycodone and clonazepan, it would have been contradicted by the evidence.[7] (Lodgment No. 2, vol. 8 at 545.) Had he simply attempted to argue that fentanyl was not the cause of death, it would have been considered implausible, at best, given the evidence. (See, e.g., R&R, at 12–13.)

Petitioner has also not shown prejudice with respect to her counsel's failure to advance a contamination theory. Even if, as Dr. Richeimer claims, contamination is a "better" explanation for the results of the tests done on de Villers' specimens, advancing this theory would have been unlikely to change the jury's verdict. The evidence from trial gives no reasonable indication that someone in the Medical Examiner's Office intentionally contaminated these specimens. Advancing this theory would not have, as a matter of reasonable probability, changed the jury's verdict.

Finally, Petitioner has not shown prejudice from failing to test the samples for fentanyl metabolites. As recognized in the R&R, a defense of challenging the cause of death was "lacking in factual or logical support." (Report, at 17.) Moreover, the results of the metabolites test would not necessarily have established that fentanyl was not the cause of death and would not show that

---

[7] Petitioner's objections flee from her petition's implication that oxycodone and clonazepam were responsible for de Villers' death. (Objections, at 4–5 ("Rossum did not and does not allege her counsel 'should have argued that an overdose of oxycodone and clonazepam . . . was the cause of death."); Memo. ISO Petition, at 29 (claiming that testing for fentanyl metabolites would "vindicate Petitioner's claim . . . that the death was caused by de Villers' self-ingestion of clonazepam and oxycodone")).) These drugs, however, are clearly the primary alternative cause of death to fentanyl being advanced by Petitioner. (Memo. ISO Petition, at 28–29.)

Petitioner was not responsible for de Villers' death. At best, this argument rests on unlikelihoods and contingencies. These do not amount to a "*reasonable probability* that . . . the result of the proceeding would have been different." Strickland, 466 U.S. at 694 (emphasis added).

While Petitioner need not demonstrate her own innocence, she is obligated to show that "the result of the proceeding would have been different." Strickland, 466 U.S. at 687. She has not done so. Therefore, even if Petitioner had shown that her counsel acted unreasonably, her claim would still be denied. However, in this case, Petitioner has established neither the unreasonableness prong nor the prejudice prong of the Strickland test. Therefore this claim is **DENIED**.

As a final matter, Petitioner's requests for (1) discovery and (2) an evidentiary hearing are also **DENIED**. As cogently and correctly stated in the R&R, Petitioner has not made the requisite showings to justify either request. (Report, at 17–22.) Therefore, the Court adopts the sections of the R&R discussing and explaining this denial. (Id.)

**B.      Petitioner's Failure to Object Arguments**

Petitioner's second argument is that her counsel should have objected to the admission of evidence of her highschool and college drug use along with drug use from after de Villers' death. (Pet. at 7–7A.) Petitioner's objection to Magistrate Judge Adler's R&R consist of (1) an objection to the R&R's conclusion, (2) reference to her petition and prior pleadings, and (3) objection to the conclusion being "based on the Report's ruling rejecting her showing as to her first claim for relief." (Objections, at 9.)

Having reviewed *de novo* the R&R's treatment of Petitioner's second argument in light of her objections, the Court finds that the R&R is entirely correct. Therefore, the Court **ADOPTS** the R&R with respect to Petitioner's second claim and **DENIES** that claim.

**C.      Petitioner's Cumulative Effect Argument**

Petitioner's final argument is the cumulative effect of her counsel's errors resulted in her not receiving a constitutionally fair trial. (Petition, at 8.) Petitioner objects in a nearly identical fashion to Judge Adler's findings on this claim as she did with her second argument. (Objections, at 10.) She objects to the R&R's conclusion "based on the reasons presented in her petition and prior pleadings" and also because that conclusion was "based on the Report's evaluation and disposition of her first

1  two claims for relief." (Id.)  However, the Court has engaged in an in-depth *de novo* review of the
2  R&R and finds that it's conclusions and logic are correct.  Therefore, the Court **ADOPTS** the R&R
3  with respect to Petitioner's third claim and **DENIES** that claim.

## CONCLUSION

For the reasons stated above, the Court **ADOPTS IN FULL** the conclusions of Magistrate Judge Adler's Report and Recommendation and **ADOPTS IN PART** its reasoning.  Petitioner's petition is hereby **DENIED** and her requests for an evidentiary hearing and for discovery are also **DENIED**.

IT IS SO ORDERED.

DATED: April 8, 2009

*Janis L. Sammartino*
Honorable Janis L. Sammartino
United States District Judge